UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Injah Tafari  #89A4807,

                              Plaintiff,

                                                          **Hon. Hugh B. Scott**

                                                          01CV0841

                    v.                                    **Decision
                                                          &
                                                          Order**

Sheldon Stein, et al.

                              Defendants.


Before the Court is the defendants' motion for summary judgment (Docket No. 94).[1]


## BACKGROUND

Plaintiff, Injah Tafari ("Plaintiff") commenced this action *pro se*, seeking relief under 42

U.S.C. § 1983 against defendants Greenhaven Correctional Facility ("Greenhaven")  Dr. Norman

H. Selwin, Dr. Harry Mamis; Lakeview Correctional Facility ("Lakeview") Dr. Jose Galindo ,

Dr. Jacob Piazza; Southport Correctional Facility ("Southport") Dr. John Alves; Clinton

Correctional Facility ("Clinton") Dr. Kang Lee and Dr. I. Ellen; Attica Correctional Facility

("Attica") Dr. Sheldon Stein, Dr. Robert Takos and Dr. Stephen Laskowski; and New York State

Department of Correctional Services ("DOCS") Medical Director Dr. Lester Wright and

---

[1]        The parties have consented to proceed before the undersigned as Magistrate Judge
pursuant to 28 U.S.C. § 636(c) (Docket No. 43).

1

Commissioner Glenn S. Goord, all sued in their personal and official capacity.[2]  (Docket No. 1)

The plaintiff claims that the defendants violated his Eight Amendment right to be free from cruel

and unusual punishment by failing to provide adequate medical treatment for the pain caused by

a broken surgical screw in his left shoulder.  (Compl. ¶¶ 44, 45, 46.)[3]

It appears undisputed that at sometime in 1984, the plaintiff underwent surgery in which a

surgical screw was inserted in his left shoulder. The plaintiff's claims in the Complaint first

relate to his medical treatment while incarcerated at the Greenhaven Correctional Facility in

1998.  While at Greenhaven, Tafari was seen by Dr. Mamis and Dr. Selwin.[4]   On November 4,

1998, Tafari was seen by Dr. Mamis.  At that time, the plaintiff  complained of pain in his left

shoulder.  Dr. Mamis noted the plaintiff's prior surgery and arranged for Tafari to be examined

---

[2]     Plaintiff initially moved for *in forma pauperis* status, which was granted.  The Court, in granting that status, dismissed certain claims and defendants from the Complaint (Docket No. 6).

[3]  As a result of additional prior motions, the Court has previously held  that: (1) the plaintiff has failed to exhaust administrative remedies as to his § 1983 claims against defendants Dr. Selwin , Dr. Mamis, Dr. Galindo, and Dr. Piazza; (2) that the Eleventh Amendment bars the plaintiff's § 1983 and state law negligence claims for money damages against all defendants in their official capacity; (3) that New York law precludes the plaintiff's pendent state law claims for negligence against all defendants in their personal capacities; and (4) that any claim for injunctive relief is moot. (Docket No. 77).  Although the complaint has already been dismissed as against defendants Dr. Selwin, Dr. Mamis, Dr. Galindo and Dr. Piazza, information relating to those defendants is relevant to describe the chronology of events underlying the remaining claims in this matter.

[4]  A suggestion of death was filed as to Dr. Selwin on October 31, 2008.  (Docket No. 93).  According to Dr. Mamis, the medical records reflect that Tafari had only two encounters with Dr. Selwin.  One encounter was the occasion on which Dr. Selwin approved a referral for Tafari to be examined by a consulting orthopedist.  The second encounter related to a review of a dermatological consult whereby Dr. Selwin ordered Tafari to have daily showers and medication to treat a skin condition and indicated that the plaintiff was to follow up with Dr. Mamis.  The plaintiff does not appear to dispute the description of these encounters with Dr. Selwin.  (Docket No. 97 at ¶ 14).

by a consulting orthopedist. (Docket No. 97 at ¶¶ 10; Docket No. 115[5] at page 400).  It appears

undisputed that the plaintiff was seen by an orthopedist who recommended removal of the screw.

According to Dr. Mamis, surgery was scheduled to take place on December 16, 1998, but that

Tafari refused to go to the hospital (Docket No. 97 at ¶¶ 11-12); (Docket No. 115 at page 506).[6]

Because Tafari allegedly refused to be treated by the orthopedist, the referral was cancelled.

(Docket No. 97 at ¶13).  Dr. Mamis states that there are no further documented complaints by the

plaintiff regarding pain in his left shoulder while at Greenhaven. (Docket No. 97 at ¶ 15).

The plaintiff was transferred to the Lakeview Correctional Facility on January 20, 1999.

(Docket No. 98 at ¶ 2). While at that facility, Tafari was seen by various medical professionals

including Dr. Piazza and Dr. Galindo. Dr. Piazza states that he had one encounter with the

plaintiff while he was housed in the Special Housing Unit.  On March 6, 1999, Dr. Piazza refilled

a medication for Tafari to treat toenail fungus.  (Docket No. 115 at page 374).  Dr. Piazza saw the

plaintiff again on March 15, 1999.  At that time, Tafari complained of an itchy scalp and pain in

his left shoulder.  Dr. Piazza ordered an x-ray of the plaintiff's shoulder. (Docket No. 155

(sealed) at page 374). On March 19, 1999, Dr. Piazza reviewed the x-ray and determined that

"there were no new findings" He directed that Tafari was to be seen by a physician if he had any

more complaints regarding his left shoulder.  (Docket No. 115 at page 374).   According to Dr.

Piazza, there is no record of further complaint by plaintiff of pain while he was at Lakeview.  The

---

[5]  In the interest of privacy, the plaintiff's medical records were filed under seal. (Docket Nos. 115, 118, 130, 131).

[6]  The Court notes that the medical treatment refusal was witnessed by two correction officers, but was not signed by the plaintiff. The plaintiff denies that he refused to be treated. (Docket No. 118 at ¶ 18).

medical records reflect that Tafari was seen, apparently by a nurse, on March 24, 1999, at which time he complained of shoulder pain.  That note indicates that Tafari was scheduled for a "M.D. callout next week" (Docket No. 115 at page 373). Again, on April 2, 1999, the plaintiff complained of shoulder pain.  The progress note for that date indicates that the plaintiff was to scheduled see a physician on April 3, 1999. (Docket No. 155 (sealed) at page 370).  Although the records reflect that the plaintiff was seen on April 5, 1999, April 7, 1999, April 8, 1999, April 10, 1999, April 11, 1999, May 11, 1999, and May 13, 1999 – there is no record of any complaint of left should pain by the plaintiff on those occasions. (Docket No. 115 at pages 367-374).  Dr. Galindo asserts that he has no recollection of ever having treated the plaintiff while he was incarcerated at Lakeview and that the medical records do not reflect any instance in which Tafari was seen by Dr. Galindo.  In his response to the instant motion, the plaintiff does not dispute this assertion by Dr. Galindo and does not point to evidence that Dr. Galindo treated the plaintiff on any occasion. (Docket No. 118).   The plaintiff transferred out of Lakeview on May 13, 1999. (Docket No. 98 at ¶ 2). The record does not reflect, and the plaintiff's responding papers do not allege, that the plaintiff advised Dr. Piazza that he had been scheduled for surgery while at Greenhaven or that the plaintiff requested that the proposed shoulder surgery to remove the broken screw be rescheduled while he was incarcerated at Lakeview.

Dr. John Alves states that he saw the plaintiff on 18 occasions between May 13, 1999 and June 5, 2000, while Tafari was incarcerated at the Southport Correctional Facility. (Docket No. 100 at ¶ 8). [7]  Dr. Alves states that only 5 of the 18 encounters with Tafari related to the

---

[7]   In his papers responding to the instant motion, the plaintiff notes that Dr. Alves treated the plaintiff, then apparently known by the name Richard Foust, in February of 1998 during a prior stay at the Southport Correctional Facility. (Docket No. 118 at ¶ 27; Exhibit E). The

plaintiff's complaints of shoulder pain. Id.  On November 7, 1999, Dr. Alves examined Tafari at which time the plaintiff indicated that he was experiencing shoulder discomfort and that the Roboxin and Feldine that he was prescribed was not helping.  Dr. Alves found that the plaintiff did not have any decreased range of motion.  (Docket No. 100 at ¶ 9; Docket No. 115 at page 329).  Dr. Alves refilled his prescription of Feldine on November 11, 1999. (Docket No. 115 at page 328).  With respect to complaints of shoulder pain, Dr. Alves next saw Tafari on November 21, 1999. He noted that Tafari had been on pain medications for his back and shoulder since September.  Dr. Alves noted that Tafari complained that the medication was not working. (Docket No. 100 at ¶ 11).  Dr. Alves was apparently scheduled to see Tafari on December 15, 1999, but Tafari refused to come to the appointment and allegedly told the escort that he "was too busy to see the doctor today." (Docket No. 100 at ¶ 12; Docket No. 115 at page 319).  The plaintiff purportedly refused to see the doctor again on December 16, 1999, this time allegedly because he was denied "front handcuffing."  Tafari instead went to recreation on that date. (Docket No. 100 at ¶13; Docket No.  115 at page 319).[8]  The plaintiff went to his appointment on December 17, 1999. Examination on that date reflected that Tafari had good range of motion, and was not in pain or distress.  A refill of Roboxin was ordered. (Docket No. 115 at page 319).

---

plaintiff also points to a March 4, 1998 "front cuff order" signed by Dr. Alves. (Docket No. 118 at Exhibit F).  The plaintiff has not articulated the materiality of this prior treatment inasmuch as the plaintiff's Complaint does not allege deliberate indifference of medical treatment prior to November of 1998.

[8]  A progress note dated December 12, 1999, reflects that Tafari saw a nurse on that date and complained of shoulder pain.  The nurse advised Tafari that he was scheduled for a physician's callout the following week.  According to the note, although the plaintiff claimed he was in excruciating pain, he  "'bounded' off bunk, waiving arms and accusing nurse of being hostile." (Docket No. 115 at page 320).

Dr. Alves stated that his last encounter with Tafari regarding his shoulder occurred on January 14, 2000. On that date, according to Dr. Alves, the plaintiff requested refills for his pain medications and the refills were provided. (Docket No. 100 at ¶15; Docket No. 155 (sealed) at page 315). Dr. Alves states that while the plaintiff was under his care at Southport he did not request to see an orthopedist. (Docket No. 123 at ¶ 6). It appears that the plaintiff was seen by other medical professionals while at Southport, and that on two occasions he complained of shoulder pain. See progress notes for January 26, 2000 (Docket No. 115 at page 313); February 11, 2000 (Docket No. 115 at page 312). However, subsequent to February of 2000 until his transfer on June 6, 2000, the progress notes reflect entries on the following dates by various medical professionals without mention of any complaint by the plaintiff of shoulder pain: February 12, 2000, February 28, 2000, March 8, 2000, March 13, 2000, March 17, 2000, March 20, 2000, March 23, 2000, March 27, 2000, March 29, 2000, March 30, 2000, March 31, 2000, April 5, 2000, April 7, 2000, April 8, 2000, April 12, 2000, April 13, 2000 April 14, 2000, April 17, 2000, April 19, 2000, April 20, 2000, April 21, 2000, April 24, 2000, April 25, 2000, April 27, 2000, April 28, 2000, April 29, 20000, May 2, 2000, May 3, 2000, May 4, 2000, May 5, 2000, May 7, 2000, May 8, 2000, May 9, 2000, May 11, 2000, May 12, 2000, May 15, 2000, May 18, 2000, May 20, 2000, May 21, 2000, May 25, 2000, May 26, 2000, May 30, 2000, June 1, 2000, June 6, 2000. (Docket No. 115 at pages 292- 312). The record does not reflect, and the plaintiff's responding papers do not allege, that the plaintiff advised Dr. Alves that he had been scheduled for surgery while at Greenhaven or that the plaintiff requested that the proposed shoulder surgery to remove the broken screw be rescheduled while he was incarcerated at Southport during the time periods relevant in this matter.

6

The plaintiff was transferred to the Clinton Correctional Facility on June 6, 2000. He

spent only 4 months during that stay at Clinton.[9]   The records reflect that the plaintiff was treated

by Dr. Lee on one occasion during this time period. On September 27, 2000, Dr. Lee saw the

plaintiff who complained of a skin problem and chronic back pain. (Docket No. 107 at ¶ 7).   Dr.

Lee noted that the plaintiff had no unusual symptoms and ordered Dove soap for his skin

condition and Motrin for back pain. (Docket No. 115 at page 272).[10]   The records do not reflect

that Dr. Lee treated Tafari with respect to his shoulder during this stay at Clinton.[11]   Similarly,

the records reflect that Dr. Ellen[12] saw the plaintiff on three occasions, but that none of those

encounters involved complaints of shoulder pain by the plaintiff. (Docket No. 115 at pages 279,

281, and 286).   In response to the instant motion, the plaintiff fails to point to any specific

---

[9]   The plaintiff was transferred back to Clinton on December 21, 2007 and continues to
be housed at that facility.

[10]   Indeed, Dr. Lee's notes reflect that he found Tafari to be "very manipulative" on that
occasion.  With respect to the plaintiff's skin condition, Dr. Lee noted that there is "no medical
indication for shower."  Further, the progress notes stated that although Tafari claims that he has
"chronic low back pain, [he] doesn't even appear to be in pain." (Docket No. 115 at page at page
272).

[11]   The plaintiff does not point to any evidence that Dr. Lee treated the plaintiff for
shoulder pain during the relevant time period.  Instead, the plaintiff points to records from 1991
which he claims demonstrate that Dr. Lee treated him for shoulder pain at that time.  (Docket No.
118 at Exhibit G). Once again, these records are not material inasmuch as they reflect treatment
prior to the relevant time period in this case.  In any event, the Court notes that these records
proffered by the plaintiff include a report dated May 8, 1992 by Dr. Howard M Baruch, the
attending orthopedic surgeon at the Helen Hayes Hospital. That report notes that although the
screw was too long, the plaintiff had excellent range of motion, no pain on palpitation, and was
neurologically intact.  Dr. Baruch concluded that the plaintiff should be treated with physical
therapy. (Docket No. 118 at Exhibit G).

[12]   A Statement Noting Death was filed alleging that Dr. Ellen died on January 23, 2009.
(Docket No. 127)

encounter with Dr. Ellen regrading the plaintiff's complaints of shoulder pain. The progress notes

reflect entries on the following dates by various medical professionals during the plaintiff's stay

at Clinton in 2000 without mention of any complaint by the plaintiff of shoulder pain: June 8,

2000, June 15, 2000, June 23, 2000, June 28, 2000, June 29, 2000, June 30, 2000, July 5, 2000,

July 7, 2000, July 10, 2000, July 12, 2000, July 14, 2000 July 17, 2000, July 18, 2000, July 20,

2000, July 23, 2000, July 25, 2000, July 26, 2000 July 28, 2000, July 31, 2000, August 1, 2000,

August 2, 2000, August 3, 2000, August 7, 2000, August 9, 2000, August 10, 2000 August 14,

2000, August 16, 2000, August 21, 2000, August 23, 2000, August 28, 2000, August 29, 2000,

September 5, 2000, September 7, 2000, September 8, 2000, September 11, 2000, September 12,

2000, September 15, 2000, September19, 2000, and September 24, 2000.[13]   The record does not

reflect, and the plaintiff's responding papers do not allege, that the plaintiff advised Dr. Lee or

Dr. Ellen that he had been scheduled for surgery while at Greenhaven or that the plaintiff

requested that the proposed shoulder surgery to remove the broken screw be rescheduled while

he was incarcerated at Southport during the time periods relevant in this matter.

On October 2, 2000, Tafari was transferred to the Attica Correctional Facility.  He

remained at Attica until July 20, 2001. (Docket No. 103 at ¶ 2).   The plaintiff's names as

defendants three physicians who treated him in some manner while he was incarcerated at Attica

during that time period: Dr. Laskowski, Dr. Takos, and Dr. Stein.  Dr. Takos states that he saw

Tafari on October 4, 2000. At that time, the plaintiff complained of having had warts removed

and requested a daily shower.  Dr. Takos denied this request as not being medically necessary.

---

[13]   These progress notes reflect that the plaintiff complained of chronic lower back pain,
issues relating to his skin and his feet.

8

On that same occasion, a physician's assistant informed Dr. Takos that Tafari complained of shoulder pain.  Dr. Takos states that the plaintiff did not tell him that he had shoulder pain.  Dr. Takos reviewed an x-ray that showed a broken screw and referred Tafari to Dr. Stein, an orthopedic surgeon (Docket No. 101 at ¶¶ 8, 12; Docket No. 115 at page 270).  At Dr. Stein's request, Dr. Takos ordered a CT scan to locate the broken screw. (Docket No. 101 at ¶ 9).  Following his referral of the plaintiff to Dr. Stein, Dr. Takos did not treat the plaintiff in connection with his shoulder pain. (Docket No. 101 at ¶¶ 14).  Dr. Takos notes that he saw Tafari on February 16, 2001 and May 18, 2001.  On February 16, 2001, Dr. Takos advised the plaintiff that he did not have a condition that warranted wearing dark glasses. (Docket No. 101 at ¶ 14; Docket No. 115 at page 241).  On May 18, 2001, Dr. Takos again advised the plaintiff that he saw no signs of photophobia.  Further, Dr. Takos noted that the plaintiff refused to have a toe nail removed which would permit Tafari to wear regular shoes. (Docket No. 101 at ¶ 15; Docket No. 115 at page 222). In his response to the instant motion, the plaintiff fails to identify any specific encounter with Dr. Takos, or to refer to any specific medical record relating to Dr. Takos' treatment of the plaintiff. The plaintiff does not dispute Dr. Takos' description of their interactions as the relate to his complaints of shoulder pain, or Dr. Takos' referral of the plaintiff to Dr. Stein.

Dr. Laskowski states that he saw Tafari on approximately 30 occasions while the plaintiff was incarcerated at Attica, but that only 7 of those encounters related to the plaintiff's complaints of shoulder pain.  (Docket No. 103 at ¶ 8).  On October 6, 2000, he examined the plaintiff and found that his range of motion and reflexes were all within normal limits. (Docket No. 103 at ¶ 10; Docket No. 115 at page 267). On October 13, 2000, Dr. Laskowski issued a "front cuff"

order based upon the plaintiff's subjective complaints of pain. (Docket No. 103 at ¶ 11; Docket No. 115 at page 265).  On October 21, 2000, the plaintiff complained that he did not receive the first "front cuff" order.  Dr. Laskowski issued a second "front cuff" order. (Docket No. 103 at ¶ 12; Docket No. 115 at page 264).  On November 18, 2000, Dr. Laskowski also referred the plaintiff to Dr. Stein for an orthopedic consult. (Docket No. 103 at ¶ 13; Docket No. 115 at page 258). On December 17, 2000, Dr. Laskowski received a note from a correction officer in the Special Housing Unit questioning the "front cuff" order because he observed Tafari "doing pull-ups by his fingertips." (Docket No. 115 at page 255). It appears that on January 25, 2001, Dr. Stein terminated the "front cuff" order as being medically unnecessary.  On January 27, 2001, Tafari requested a "front cuff" order from Dr. Laskowski, who denied the request based upon the determination by Dr. Stein, the orthopedic surgeon treating Tafari for his shoulder issue. (Docket No. 103 at ¶ 14; Docket No. 115 at page 248). On February 3, 2001, Tafari advised Dr. Laskowski that he would like the screw removed from his shoulder. Dr. Laskowski, who is not an orthopedic surgeon, deferred to Dr. Stein. (Docket No. 103 at ¶ 15; Docket No. 115 at page 246).  On May 11, 2001, Tafari requested a second opinion regarding the screw in his left shoulder.  Dr. Laskowski stated that he followed the instruction and care suggested by the orthopedic specialist, Dr. Stein, and did not see symptoms indicating that a second opinion was necessary.  (Docket No. 103 at ¶¶ 17-20; Docket No. 115 at page 224).

Dr. Stein states that he saw the plaintiff on October 26, 2000 and January 25, 2001.  On October 26, 2000, the plaintiff complained of limited range of motion in his left shoulder and raised the question of whether it was necessary to remove the broken screw.  Dr. Stein states that his upon examination, Tafari's complaints were "contrary to the objective tests that" he

performed. Dr. Stein determined that the plaintiff was not restricted as he claimed, but "actually had over twice the degree of range of motion that he claimed." (Docket No. 102 at ¶ 10; Docket No. 115 at page 67). Dr. Stein noted that he found the plaintiff to be "uncooperative and untruthful" regarding his complaints. (Docket No. 115 at page 67).[14]   X-rays of the plaintiff's shoulder were not available for Dr. Stein to review on that occasion. He determined that a CT scan would be the best way to determine if it was necessary to remove the screw.  Until he had an opportunity to review the x-rays, Dr. Stein determined it was best to continue the "front cuff" order. (Docket No. 102 at ¶ 11; Docket No. 115 at page 67).  According to Dr. Stein, the CT scan confirmed that both fragments of the fractured screw were within the bone. (Docket No. 115 at page 65).  After reviewing the CT scan results, Dr. Stein examined the plaintiff on January 25, 2001.  At that time he determined that because both fragments of the screw were within the bone and not in contact with other structures, it is medically accepted that the screw poses no risk. Based upon his medical judgment as an orthopedic specialist, Dr. Stein determined that surgery was not necessary inasmuch as the plaintiff had "both a good range of motion of his shoulder, good muscle strength and no problem relating to the broken screw." (Docket No. 102 at ¶ 15-17; Docket No. 115 at page 68). Dr. Stein also determined that a "front cuff" order was no longer necessary. (Docket No. 102 at ¶ 18).   The plaintiff was transferred from Attica on July 20, 2001.

---

[14]   According to Dr. Stein: "Examination reveals the patient to be uncooperative and untruthful.  He claimed he was unable to abduct more than 30 degrees and forward flex more than 30 degrees but passively I was able to get him to at least 70-80 degrees in both planes, almost to 90 degrees in forward flexion.  He did have some restriction to internal rotation.  I did measure his muscle girth which was measured at 15 cm above and below the olecranon process bilaterally and was equal in both upper extremities indicating that this patient actually works out and has a good range of motion of his left upper extremity greater than he was willing to reveal. He forcefully was pushing my hand down when I tried to abduct or forward flex indicating significant muscle strength." (Docket No. 115 at page 67).

It was subsequently determined that it would be appropriate to remove the screw in the plaintiff's left shoulder.  In opposition to the instant motion, the plaintiff submits an affirmation from Dr. Jonathan L. Holder, an orthopedic surgeon. Dr. Holder states that Tafari's medical history reveals long standing complaints of pain in his left shoulder due to a serious medical condition. (Docket No. 119 at ¶ 5).   Dr. Holder performed surgery on the plaintiff on May 14, 2007 and October 30, 2007, apparently to remove the screw in the plaintiff's left shoulder.  Dr. Holder states that in his opinion the surgeries "were necessary, and were due to complaints of pain that had existed for a long period of time." (Docket No. 119 at ¶ 8.)  He further states that, in his opinion, the plaintiff would have continued to experience pain in the future if the surgeries had not been performed.

## DISCUSSION

**Motion for Summary Judgment**

Summary judgment is appropriate where there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law.  See Trans Port, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (citing Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The Court must draw all reasonable inferences in favor of the non-moving party and grant summary judgment only if no reasonable trier of fact could find in favor of the non-moving party.  See Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991); Howley v. Town of Stratford, 217 F.3d 141 (2nd Cir. 2000).  However, the non-moving party must, "demonstrate to the court the existence of a genuine issue of material fact."  Lendino v. Trans Union Credit Information, Co., 970 F.2d 1110, 1112 (2d Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S.

317, 324 (1986)). A fact is material:

> when its resolution would "affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

General Electric Company v. New York State Department of Labor, 936 F.2d 1448, 1452 (2d Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The non-moving party must come forward with enough evidence to support a jury verdict . . . and the . . . motion will not be defeated merely . . . on the basis of conjecture or surmise." Trans Sport, 964 F.2d at 188 (citing Bryant v. Maffucci, 923 F.2d at 982). If undisputed material facts are properly placed before the court by the moving party, those facts will be deemed admitted, unless they are properly controverted by the non-moving party." Glazer v. Formica Corp., 964 F.2d 149, 154 (2d Cir. 1992) (citing Dusanenko v. Maloney, 726 F.2d 82 (2d Cir. 1984). The Court's responsibility in addressing a summary judgment motion is identifying factual issues, not resolving them. See Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 528 (2d Cir. 1990). However, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc., 235 F.3d 53 (2d Cir. 2000) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).


**Eighth Amendment Claims**

The Eighth Amendment outlaws "cruel and unusual punishments." U.S. Const. amend. VIII. "This includes punishments that 'involve the unnecessary and wanton infliction of pain.' "

Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998) (quoting Gregg v. Georgia, 428 U.S. 153,

173 (1976)). See also Hernandez v. Keane, 341 F.3d 137, 144 (2d. Cir. 2003).  While "society

does not expect that prisoners will have unqualified access to health care," Hudson v. McMillian,

503 U.S. 1, 9 (1992), an inmate can nevertheless prevail on an Eighth Amendment claim arising

out of medical care by showing that a prison official acted with "deliberate indifference" to the

inmate's serious medical needs. Hathaway v. Coughlin, ("Hathaway I"), 37 F.3d 63, 66 (2d

Cir.1994) (quoting Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

        This standard incorporates both objective and subjective elements. The objective

"medical need" element measures the severity of the alleged deprivation, while the subjective

"deliberate indifference" element ensures that the defendant prison official acted with a

sufficiently culpable state of mind.  Smith v. Carpenter, 316 F.3d 178, 183 -184 (2d. Cir. 2003).

To prevail on a constitutional claim of deliberate medical indifference, a plaintiff must prove that

he suffered from an objectively serious medical condition, which the defendants knew of and

deliberately disregarded. Green v. Senkowski, 2004 WL 1292786, *1 (2nd Cir.  2004) citing

Chance, 143 F.3d at 702 (collecting cases). A serious medical condition is one that may result in

death, degeneration, or "chronic and substantial pain." Id.; see Hathaway I, 37 F.3d at 66.  This

standard contemplates a "condition of urgency, one that may produce death, degeneration, or

extreme pain." Nance v. Kelly, 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)). A serious

medical need arises where "the failure to treat a prisoner's condition could result in further

significant injury or the unnecessary and wanton infliction of pain." Chance, 143 F.3d at 702.  To

satisfy the subjective prong of the test, prison officials must have acted with a sufficiently

culpable state of mind, i.e., deliberate indifference. Plaintiff must therefore show that prison

14

officials intentionally denied, delayed access to, or intentionally interfered with prescribed

treatment. See Estelle, 429 U.S. at 104-05. See also Farmer v. Brennan, 511 U.S. 825, 837

(1994)("[A] prison official cannot be found liable under the Eighth Amendment for denying an

inmate humane conditions of confinement unless the official knows of and disregards an

excessive risk to inmate health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference."). "[T]he subjective element of deliberate indifference 'entails something more than

mere negligence ... [but] something less than acts or omissions for the very purpose of causing

harm or with knowledge that harm will result." ' Hathaway II, 99 F.3d at 553 (quoting Farmer,

511 U.S. at 835). Accordingly, subjective recklessness can satisfy the deliberate indifference

standard where "the official has actual knowledge that the prisoner faced a substantial risk of

serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer,

511 U.S. at 847. However, "[m]edical malpractice does not become a constitutional violation

merely because the victim is a prisoner." Estelle, 429 U.S. at 106.

Also, it is well-established that a prisoner is not entitled to receive the medical treatment

of his choice.  So long as the treatment given is adequate, the fact that a prisoner might prefer a

different treatment or a different doctor does not give rise to an Eighth Amendment violation.

Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir.1986) (The essential test is one of medical necessity

and not one simply of desirability).  A difference of opinion between a prisoner-patient and

prison medical authorities regarding treatment does not give rise to a § 1983  claim. Chance v.

Armstrong, 143 F.3d 698, 703 (2d Cir.1998); Dean v. Coughlin, 804 F.2d 207, 215 (2d

Cir.1986);  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir.1981).  The Constitution does not

require that an inmate receive a particular course of treatment, or that an inmate see a requested specialist. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997), Davis v. Hall, 992 F.2d 151, 153 (8th Cir.1993).

Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. Chance v.Armstrong, 143 F.3d. 698 (2d. Cir. 1998);  Johnson v. Snow, 2008 WL 2224949 (N.D.N.Y., 2008); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.1989); Sires v. Berman, 834 F.2d 9, 13 (1st Cir.1987) ("Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, [a court] will not second guess the doctors." (citations omitted)).

Finally, it is well settled that a plaintiff asserting an Eighth Amendment claim based upon inadequate medical care must establish deliberate indifference for each individual defendant against whom the claim is asserted. Brock v. Wright, 315 F.3d 158, 164 (2d Cir.2003)(stating that plaintiff must show deliberate indifference on the part of a "particular defendant").


**Claims Against Selwin, Mamis, Galindo, Piazza,
Lee, Ellen, Takos, Laskowski and Stein**

As a general matter, the plaintiff has submitted voluminous medical records in response to the instant motion. (Docket No. 118, Exhibits D- J).  By Order dated February 5, 2009, the plaintiff was permitted to supplement this response with additional medical records. (Docket

Nos. 130 and 131).[15]  The vast majority of these medical records relate to medical treatment the

plaintiff received prior to, or subsequent to, the dates involved in the complaint.  The record, as a

whole, indicates that the plaintiff suffered from a chronic shoulder problems relating to recurrent

dislocation which was addressed by surgery in 1984.  The medical records reflect that the

plaintiff subsequently complained of shoulder pain sporadically throughout the years of his

incarceration. Of course, some medical conditions can change over time; alternatively worsening

and improving.  Tate v. Bell, 2007 WL 1965592 (S. D. Ohio, 2007) (medical conditions may

change over time).  After the 1984 surgery and during the time period between May 1998 to July

2001 at issue in this case, the medial records reflect time periods in which the plaintiff

complained of shoulder pain, and other time periods in which there was an absence of complaints

of left shoulder pain by the plaintiff. (Docket Nos. 115, 118, 130, 131).  Early on, in 1985, it was

determined that the screw which had been inserted in the plaintiff's shoulder was slightly longer

than necessary. The record reflects that the plaintiff was not certain, at that time, whether he

wanted to undergo surgery to remove the screw. (See March 19, 1985 report from Dr. Peter

Goodnough submitted as part of Docket No. 131 at page 5).[16]  Later x-rays revealed that the

screw was broken. Further, the medical records indicate that even subsequent to the dates

---

[15]   Tafari submitted many of these documents directly to the Court.  Other documents
were submitted by counsel at Tafari's insistence. See Plaintiff's Letters to the Court,  Docket
Nos. 133 and 134.  In many instances, these additional documents were not relevant to, or
supportive of, the plaintiff's claims.  The Court notes that the counsel for the plaintiff – who was
appointed to represent the plaintiff very late in this case, and only for the anticipated trial – has
been a strong advocate for the plaintiff's interest and performed admirably under difficult
circumstances.

[16]   Page numbers relating to Docket No. 131 refer to handwritten numbers located in top
right corner of the medical records submitted in that filing. The numbers were present on the
documents when submitted to the Court.

involved in the complaint, the plaintiff was seen by at least four orthopedic specialists without a firm conclusion as to whether surgery was appropriate. (Document dated February 6, 2006 submitted as part of Docket No. 131 at page 38).   The record includes competing opinions by orthopedic specialists, at least two who concluded that Tafari did not require surgery to address the screw in his shoulder (Docket No. 118 at Exhibit G; Docket No. 115 at page 68). Subsequent to the time period involved in the complaint, a physiatrist suggested steroid injections.  (Report dated May 10, 2005 submitted as part of Docket No. 131 at page 32).  On October 14, 2005, Dr. R. Mitchell Rubinovich, an orthopedic surgeon, stated that he advised Tafari that he "cannot be certain exactly where [the plaintiff's] pain is coming from nor can I be certain that we can find or remove the screw or finally, that if we do open his shoulder, whether we will be able to reconstruct his anterior glenoid and capsule because of the previous surgery."   (Report dated October 14, 2005 submitted as part of Docket No. 131 at page 35).  At some time in 2006, it was determined that surgery would be appropriate and was scheduled to take place on May 25, 2006. Notwithstanding the finding that surgery was appropriate, the surgery was considered "elective." (Report dated May 16, 2006 submitted as part of Docket No. 131 at page 40).  That surgery was cancelled, however, after the plaintiff "became aggressive and anxious;" he attempted to assault a nurse on April, 24, 2006; he attempted to assault an officer on May 10, 2006; he did assault an officer on May 11, 2006; and he threatened to commit suicide after he had shoulder surgery. (Report dated May 16, 2006 submitted as part of Docket No. 131 at page 40).  He was referred to a psychiatrist who indicated that it was "not advisable for the plaintiff to have an elective surgery at this time." Id.  Surgery was performed on May 14, 2007.  A second surgery was performed on

October 30, 2008. (Docket No. 118 at ¶ 14).[17]

The instant action only concerns the treatment provided to the plaintiff by the defendant physicians during the period from May 18, 1998 to July 20, 2001.  To recover as against any defendant, as noted above, the plaintiff must establish deliberate indifference on the part of that specific defendant.  The complaint in this case has previously been dismissed as against Dr. Selwin , Dr. Mamis, Dr. Galindo and Dr. Piazza based upon the plaintiff's failure to exhaust any administrative remedies as to those defendants. Even if the plaintiff was found to have exhausted administrative remedies as against these four defendants, summary judgment would be appropriate inasmuch as the plaintiff has not articulated a factual or legal basis which could support a finding of deliberate indifference on the part of these individuals.  Neither Dr. Selwin , nor Dr. Mamis are orthopedic specialists.  The plaintiff has not pointed to evidence in the record disputing the assertion that Dr. Selwin only had two encounters with Tafari: one in which he approved a referral for the plaintiff to be examined by an orthopedic specialist and a second relating to a skin condition.   Dr. Mamis saw the plaintiff on a few occasions, referring the plaintiff to an orthopedic specialist relating to his complaints of shoulder pain. As a result of this referral, surgery to be performed by an orthopedic specialist was scheduled.  The defendants have produced documentary evidence suggesting that the plaintiff refused to go to the hospital on December 15, 1998 for the surgery. (Docket No. 115 at page 506).  This refusal was witnesses by a nurse and a correctional officer who signed the Refusal of Medical Examination form.  The plaintiff does not offer any specific explanation of the events of December 15, 1998, but asserts

---

[17]   It is uncertain, based upon the record before the Court, whether the surgeries have successfully alleviated the plaintiff's left shoulder pain.  This question, however, is immaterial to the issues in this case.

that he did not refuse to go to the hospital.[18]  It is noted that the plaintiff did not name the nurse

or correctional officer who signed the refusal form as defendants in this case.  The plaintiff does

not allege, and there is no documentary evidence to suggest,  that Dr. Mamis took any action to

prevent the plaintiff from being taken to the hospital on December 15, 1998.  The plaintiff does

not allege, and the record does not suggest, that Tafari asked Dr. Mamis to reschedule the surgery

during the plaintiff's remaining stay at Greenhaven. The plaintiff did not file a grievance relating

to his failure to be taken to the hospital for the scheduled surgery while at Greenhaven, or even

while at Lakeview or Southport (the next two facilities to which he was transferred).   The

plaintiff has failed to articulate, as a matter of law, a factual basis upon which a trier of fact could

conclude that Dr. Selwin or Dr. Mamis were deliberately indifferent to the plaintiff's medical

needs.

        As noted above, Dr. Galindo asserts that he did not treat the plaintiff for shoulder pain.

The record supports that assertion. The plaintiff has failed to articulate, as a matter of law, a

factual basis upon which a trier of fact could conclude that Dr. Galindo was deliberately

indifferent to the plaintiff's medical needs. During the plaintiff's short five-month stay at

Lakeview in 1999, the plaintiff did complain of shoulder pain to Dr. Piazza. The medical record

reflects that Dr. Piazza ordered an x-ray of the plaintiff's shoulder and that the plaintiff had been

taking pain medication at while at Lakeview.  (Docket No. 115 at pages 370, 374).  Dr. Piazza

---

        [18]   The plaintiff contends that although he did not go to the hospital on December 15,
1998, he was seen for a consultative exam on December 16, 1998.  He argues that it does not
make sense that he would refuse to go to the hospital on one day, but allow himself to be seen for
an examination the next day. (Docket No. 118 at ¶¶ 18-19).  In support of this contention, the
plaintiff cites to a Report of Consultation dated December 16, 1998.  However, the document to
which the plaintiff cites does not reflect that an examination took place on December 16, 1998,
but instead states "12/16 – Refused."  (Docket No. 118 at Exhibit D).

directed that if Tafari continued to complain of pain, he was to be seen by a physician.  The

record reflects that the plaintiff did complain of pain on two subsequent occasions, and that on

each occasion the progress notes indicate that he was scheduled to see a physician.  The medical

records reflect that the plaintiff was subsequently seen by medical professionals on seven further

encounters before he was transferred from Lakeview but did not complain of shoulder pain on

any of those occasions. (Docket No. 115 at page 367-374). The record does not reflect that the

plaintiff had any further discussions with Dr. Piazza regarding his shoulder pain.  The plaintiff

has not alleged, and the record does not reflect, that Tafari advised Dr. Piazza of the fact that

surgery had been recently scheduled to address his shoulder issue or that he desired Dr. Piazza to

reschedule the surgery.   Based upon this record, the plaintiff has failed to articulate, as a matter

of law, a factual basis upon which a trier of fact could conclude that Dr. Piazza was deliberately

indifferent to the plaintiff's medical needs.

The plaintiff has similarly failed to articulate a factual basis, as a matter of law, upon

which a trier of fact could conclude that Dr. Alves was deliberately indifferent to the plaintiff's

medical needs.  As reflected above, during the relevant time period, Dr. Alves saw Tafari on 18

occasions, and that the plaintiff complained of shoulder pain during only five of these

encounters.  Dr. Alves treated the plaintiff's complaints of shoulder pain with pain medication.

The record reflects that Dr. Alves examined Tafari on December 17, 1999, at which time he

determined that the plaintiff had good range of motion and was not in pain or distress. (Docket

No. 155 at 319). According to Dr. Alves, he last saw Tafari on January 14, 2000, at which time

he refilled prescriptions for the pain medication.  (Docket No. 115 at 315).  Dr. Alves testifies

that while at Southport during this time frame the plaintiff did not ask to see an orthopedist. The

record reflects that the plaintiff complained of shoulder pain to other medical professionals on

January 26, 2000 and February 11, 2000. (Docket No. 115 at pages 312, 313).  However,

subsequent to the February 11, 2000 visit, it appears that the plaintiff's shoulder pain receded

inasmuch as the medical records reflect that  Tafari was seen by medical professionals on 44

consecutive occasions without any record of a complaint of left shoulder pain. (Docket No. 115

at pages 292-312).  The plaintiff does not dispute the description of the treatment provided by Dr.

Alves during the relevant time period, but asserts that Dr. Alves had treated him earlier in 1998.

(Docket No. 118 at ¶¶ 27-28).  The plaintiff cites to a January 19, 1998 x-ray report noting the

fact that the screw in Tafari's shoulder was broken. (Docket No. 118 at Exhibit E).  This report

does not serve as a basis for finding deliberate indifference on the part of Dr. Alves.  Although

the report reflects that Dr. Alves knew or should have known that the plaintiff had a broken

screw in his shoulder, the document states no medical opinion that surgery was required under

the circumstances.  There are often several appropriate courses of treatment a physician may

pursue to address a patient's complaints.  As reflected in the subsequent medical records

discussed above, there was not universal agreement as to the best treatment regarding the

plaintiff's shoulder issues, and although surgery was eventually determined to be appropriate, it

was considered to be "elective."  The record in this case would not support a factual finding that

Dr. Alves failed to treat the plaintiff with respect to the pain in his shoulder. The plaintiff's

retrospective disagreement with Dr. Alves as to what treatment was appropriate during the

relevant time period cannot legally support a claim of deliberate indifference.

With respect to Dr. Lee, the records reflect that he saw Tafari only on one occasion

during his stay at Clinton in 2000.  On that occasion, the plaintiff complained of a skin condition

and lower back pain, but did not complain of shoulder pain.  (Docket No. 115 at 272).   Once

again, the plaintiff does not dispute this description of the treatment he received from Dr. Lee in

2000, but asserts that Dr. Lee had treated him in 1991 and was aware of the fact that he

experienced shoulder pain in 1991.  This action does not concern the medical treatment the

plaintiff received in 1991, which is well beyond the statute of limitations.[19]  In any event, for the

purposes of the deliberate indifference claim in this case, Dr. Lee was only required to treat the

plaintiff with respect to the complaints being presented to him by the plaintiff in 2000.  Inasmuch

as the plaintiff did not complain of shoulder pain to Dr. Lee in 2000, the plaintiff has failed to

articulate a factual basis, as a matter of law, upon which a trier of fact could conclude that Dr.

Lee was deliberately indifferent to the plaintiff's medical needs in that regard.  The medical

records similarly indicate that the plaintiff did not complain of shoulder pain to Dr. Ellen during

any visit while incarcerated at Clinton in 2000.  Again, the plaintiff does not refute this

description regarding his encounters with Dr. Ellen in 2000, or provide any other basis upon

which it could be found that Dr. Ellen was deliberately indifferent to his medical needs.

With respect to the treatment provided by Dr. Takos and Dr. Laskowski during the

plaintiff's stay at Attica from October 2000 to July of 2001, the record reflects that both

physicians promptly referred the plaintiff to an orthopedic specialist, Dr. Stein, for treatment of

his complaints of shoulder pain. Particularly in light of the totality of the record in this case

which reflects that the plaintiff's condition was subject to change over time, and that differences

of opinion existed among specialists as to the warranted treatment, Dr. Takos and Dr. Laskowski

---

[19]    The plaintiff admits that Dr. Lee ordered x-rays and prescribed pain medication in
1991 to treat his complaints of shoulder pain. (Docket No. 118 at ¶ 30).  In light of the overall
record in this case, such treatment belies a claim of deliberate indifference.

(who were not orthopedic specialists)  were entitled to rely upon the medical opinion of Dr. Stein as to the proper treatment of the plaintiff's shoulder pain. In his response to the instant motion, the plaintiff does not dispute the description of the treatment he received by Dr. Takos and Dr. Laskowski.  The plaintiff has failed to articulate a factual basis, as a matter of law, upon which a trier of fact could conclude that Dr. Takos or Dr. Laskowski were deliberately indifferent to the plaintiff's medical needs in that regard.  Finally, with respect to Dr. Stein, the record indicates that Dr. Stein conducted an examination of the plaintiff, including an assessment of his range of motion and his muscle strength in his left shoulder.  Dr. Stein also requested a CT scan to determine the location of the broken screw in the plaintiff's shoulder.  The fact that Dr. Stein concluded that the plaintiff did not require surgery to address his complaints of pain does not establish that he was deliberately indifferent to the plaintiff's medical needs.  Indeed, as noted above, the record reflects differing opinions from other orthopedic specialists who subsequently examined the plaintiff as to whether surgery was necessary.  Subsequent to the  treatment he received from Dr. Stein, another orthopedic specialist advised Tafari that he could not even be certain where the shoulder pain was coming from or whether surgery would successfully relieve that pain. (Docket No. 131 at 35).  A difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. Chance v.Armstrong, 143 F.3d. 698 (2d. Cir. 1998); Johnson v. Snow, 2008 WL 2224949 (N.D.N.Y., 2008).

**Claims Against Dr. Lester Wright**
**and Commissioner Glenn S. Goord**

The plaintiff asserts a claim of deliberate indifference against Dr. Wright based upon a letter Tafari wrote on July 23, 2001 to Dr. Wright, as Chief Medical Officer of the New York State Department of Correctional Services, asking that Dr. Wright direct his doctor to make arrangements for surgery.  Similarly, the plaintiff wrote to Commissioner Goord on September 16, 2001 complaining that his doctors have failed to arrange for surgery to remove the screw in his shoulder (along with complaints that soy products are causing him a skin condition). (Docket No. 126).  Inasmuch as the Court finds that the plaintiff has failed to articulate a factual basis upon which a trier of fact could find that any of the physician defendants were deliberately indifferent to the plaintiff's medical needs, these derivative claims must also fail.  See also Ward v. Goord, 2009 WL 102928 (N.D.N.Y. 2009)(failing to "receive a response to a complaint ... is insufficient to establish personal involvement [especially when] there is no other showing that [defendant] knew of or directly participated in any alleged violation."); Abbas v. Senkowski, 2005 WL 2179426, at *2 (N.D.N.Y. 2005)(same); Higgins v. Artuz, 1997 WL 466505, at *7 (S.D.N.Y. 1997) (noting that a letter from a prisoner to corrections commissioner does not necessarily establish personal involvement); Chavis v. Kienert, 2005 WL 2452150, at *22-23 (N.D.N.Y.  2005)(dismissing inmate's Eighth Amendment medical-indifference claim against Dr. Lester Wright based on lack of personal involvement where Dr. Wright repeatedly ignored plaintiff's letters regarding medical complaints).

**Conclusion**

Based on the above, the defendants' motion for summary judgment is granted.  The

complaint is dismissed as to all defendants.  Further, the Court hereby certifies, pursuant to 28

U.S.C. 1915(a)(3), that any appeal in this matter would not be taken in good faith, and leave to

appeal to the Court of Appeals as a poor person is denied.  Coppedge v. United States, 369 U.S.

438, 82 S. Ct. 917, 8 L. Ed.2d 21 (1962).  Further requests to proceed on appeal as a poor person

should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in

accordance with Rule 24 of the Federal Rules of Appellate Procedure.

So Ordered.


_____
/s/ Hugh B. Scott
United States Magistrate Judge
Western District of New York

Buffalo, New York
February 9, 2009